PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EXAL CORPORATION, | ) | |
| | ) | CASE NO. 4:12CV1830 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| ROESLEIN & ASSOCIATES, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** [Resolving ECF Nos. 137; 147] |

Pending before the Court is a Motion for Summary Judgment filed by Defendant Roeslein & Associates ("Roeslein"). ECF Nos. 137; 147.[1]  The Court has been advised, having reviewed the record, including the parties' briefs and the applicable law.  For the reasons provided below, the Court hereby denies Roeslein's Motion for Summary Judgment as to Count VI, the claim for tortious interference with prospective economic advantage lodged in Plaintiff Exal Corporation's ("Exal") Second Amended Complaint (ECF No. 101) and grants the motion as to Exal's remaining claims.

## I.  Factual and Procedural Background

The parties in this case both operate within the aluminum manufacturing industry.  Exal is an aluminum can and bottle manufacturing company located in Youngstown, Ohio.  ECF No. 101 ¶ 1.  Roeslein is an engineering and consulting firm located in St. Louis, Missouri that assists aluminum can and bottle manufacturing companies like Exal.  Id. ¶ 3.  This litigation arose from

---

[1] ECF No. 147 is the redacted version of the motion for summary judgment filed under seal at ECF No. 137.

(4:12cv1830)

three contracts entered into by the parties—two purchase orders, one entered into on October 8, 2009 ("2009 Purchase Order") and the other entered into on January 10, 2011 ("2011 Purchase Order") and a stand-alone Mutual Confidentiality Agreement governing the parties' use of confidential information.  ECF Nos. 141-2; 141-3; 141-4.

Exal began its business relationship with Anheuser-Busch InBev ("AB") in 2005 manufacturing 16-ounce aluminum beverage containers shaped like a bottle with a screw top ("bottle cans") through a process called impact extrusion.[2]  ECF No. 101 ¶¶ 37–38.  Around that time, Exal began planning to expand production capabilities by implementing a more cost-effective manufacturing process, known in the industry as draw and iron but referred to by Exal as "Coil to Can," or C2C.[3]  Id. ¶ 40.  Exal had difficulties implementing a commercially-viable C2C line, and it had previously sought assistance from both AB and Metal Container Company[4] ("MCC") in improving the C2C line.  ECF No. 137-14 at 170.  In 2006, Exal permitted employees of AB and MCC to review Exal's C2C process and take notes on the machines that Exal used.  ECF No. 137-19 at 141.

In 2009, Exal and AB entered into negotiations for a new contract, pursuant to which Exal would increase production of bottle cans manufactured by its C2C lines.  ECF No. 137-4 at 92.  Exal retained Roeslein to assist with the expansion of Exal's facilities necessary to

---

[2]  Impact extrusion forms can and bottle cylinders by repeatedly hitting an aluminum slug into the proper shape.  ECF No. 137-9 at 32.

[3]  Both processes generally involve punching out a disc from an uncoiled aluminum sheet and forming the cylinder with an ironing machine.  ECF No. 137-9 at 33, 36.

[4]  MCC is a wholly-owned subsidiary of AB.  ECF No. 137 at 7 n.1.

2

(4:12cv1830)

accommodate the anticipated increase in production.  ECF No. 141-1.  Exal and Roeslein

formalized their relationship by signing the 2009 Purchase Order.  ECF No. 141-2.  The parties

also executed a Mutual Confidentiality Agreement to "ensure the confidentiality of their

respective confidential information that is disclosed to each other."  ECF No. 141-4 at 2.  For the

next couple of years, Roeslein assisted Exal with the improvement of Exal's C2C line, including

by designing a line layout, compiling a list of equipment needs, and obtaining pricing quotations

from vendors.  ECF Nos. 141-1 at 3; 141-8 at 23, p. 82.  Exal and Roeslein later signed the 2011

Purchase Order, which required Roeslein to offer maintenance service and advice on increasing

the C2C lines' productivity.  ECF No. 141-3.  Both purchase orders contain confidentiality

provisions.

Exal and AB reached an agreement in principle at some time in December 2010 that

provided for Exal to produce 400 million 16-ounce C2C bottle cans per year (the "Original

Agreement").  ECF No. 137-23 at 17.  A month later, however, AB informed Exal that it

intended to review all of the company's metal purchasing agreements, starting with the Original

Agreement.  Id. at 18.  In February 2011, AB informed Exal that it no longer intended to sign the

Original Agreement.  Id.  Exal contends that it continued to negotiate with AB with the hopes

that it would ultimately produce 16-ounce C2C bottle cans for AB.  ECF No. 137-2 at 55.

Meanwhile, Roeslein had begun to work with AB and MCC on other projects.  For

example, in July 2010, Roeslein and AB representatives met to discuss vertical integration of

AB's traditional, or standard, can manufacturing (as opposed to bottle can) and the cost of

operating a plant in Brazil.  ECF Nos. 137-6 at 149; 141-13 at 3.  Also in July 2010, Roeslein

3

(4:12cv1830)

hosted AB and MCC representatives for a tour Roeslein's facility in Red Bud, Illinois to allow AB to inspect Roeslein's plant and to discuss can manufacturing. ECF Nos. 137-17 at 53–54; 141-13 at 3. In February 2011, Roeslein and AB representatives met again to discuss aluminum cans when AB invited Roeslein employees to its can manufacturing plant in Arnold, Missouri. ECF No. 141-14 at 50 p. 193. Two months later, AB contacted Roeslein for the specifications of a bottle can necking machine. Id. at 51 p. 198. David May, President of Roeslein, met with an MCC representative during a May 2011 trade show and discussed the possibility of MCC retaining Roeslein's services in connection to installation of a production line at MCC's plant in Arnold. ECF No. 141-18 at 21 p. 77.

These interactions, as well as Roeslein's reputation as a leader in the can manufacturing industry, eventually culminated in an agreement between Roeslein and MCC in June 2011, under which Roeslein assisted MCC in developing its own aluminum bottle can production line. ECF Nos. 137-17 at 60; 141-20. It is not clear whether Roeslein and MCC had discussed Roeslein's connection with Exal when Roeslein began working with MCC. David May testified that he asked MCC whether the MCC project would adversely affect Exal. ECF No. 137-24 at 305. Mark Viox, MCC's Director of Technology, could not recall whether Roeslein's work with Exal came up during negotiations of the June 2011 agreement. ECF No. 137-17 at 63. It is uncontested, however, that Roeslein did not inform Exal of Roeslein's work with MCC before Roeslein entered into the agreement with MCC. ECF No. 141-6 at 48 p. 187. Mike Hoffman, Exal's CEO, testified that May had called him "out of the blue" in October 2011—four months later—to reassure Hoffman that the work Roeslein was doing for MCC would not affect Exal's

4

(4:12cv1830)

business with AB.  ECF No. 141-23 at 16 p. 59.  It was not until later, and from sources other than Roeslein, that Exal learned that Roeslein's work for MCC involved assisting MCC develop its own C2C line.  ECF No. 141-23 at 17 p. 63.

Some time in February 2012, Exal found out that AB would not hire Exal to produce 16-ounce C2C bottle cans.  ECF No. 137-2 at 55.  Instead, AB awarded the contract to MCC because MCC offered lower prices than Exal.  ECF No. 137-17 at 116.  Exal was able to negotiate a different contract with AB—one that required Exal to supply AB with a smaller quantity of a less-profitable bottle can.  ECF No. 137-2 at 51–52.

Exal commenced this lawsuit on July 17, 2012, alleging misappropriation of trade secrets, common law fraud, breach of contract, tortious interference with prospective economic advantage, and tortious interference with a business relationship.  ECF No. 1.  Roeslein moved to dismiss Exal's fraud and tortious interference claims pursuant to Fed. R. Civ. P. 12(b)(6), and for a more definitive statement as to all claims.  ECF Nos. 19; 20.[5]  The Court granted Roeslein's motion for a more definitive statement on Exal's fraud claim, but otherwise denied the rest of Roeslein's motions.  ECF No. 39.[6]

Exal filed a First Amended Complaint to expand its fraud claim into common law fraud and fraud in the inducement.  ECF No. 42 at 20, 23.  Following the resolution of a dispute that

---

[5]  Roeslein moved for a more definitive statement as to Exal's fraud and tortious interference claims in ECF No. 19; and a more definitive statement as to Exal's misappropriation of trade secrets and breach of contract claims in ECF No. 20.

[6]  The Honorable David D. Dowd, Jr. presided.  The case was reassigned to the instant Court on November 21, 2013.  *See* ECF No. 112.

(4:12cv1830)

arose during discovery, Exal was granted leave to file a Second Amended Complaint that

includes claims of (I) common law fraud; (II) fraud in the inducement; (III) breach of contract —

Mutual Confidentiality Agreement; (IV) breach of contract — 2009 Purchase Order; (V) breach

of contract — 2011 Purchase Order; (VI) tortious interference with prospective economic

advantage; (VII) tortious interference with a business relationship; and (VIII) misappropriation of

trade secrets.  ECF No. 101.  Roeslein moved to dismiss Counts I, II, and VIII  pursuant to Fed.

R. Civ. P. 12(b)(6).  ECF No. 104.  The Court granted Roeslein's motion as to Count VIII

because Exal had failed to present evidence of the unauthorized use of a trade secret.  ECF No.

119 at 7–10.  The Court also granted Roeslein's motion as to Count I but denied the motion as to

Count II, as only the latter claim "stems from a separate and independent duty unrelated to the

parties' contractual obligations."  Id. at 11 (quoting King v. Hertz Corp., 2011 WL 1297266, at

*2 (N.D. Ohio March 31, 2011)).

     Roeslein now moves for summary judgment on Exal's remaining claims.  ECF Nos. 137;

147.  Roeslein contends that Exal's breach of contract claims (Counts III, IV, and V) must fail

because Exal cannot demonstrate that Roeslein disclosed confidential information to AB or

MCC.  ECF No 137 at 15–24.  Roeslein argues that Exal has failed to establish its tortious

interference claims (Counts VI and VII) because it has not presented any evidence that Roeslein

had committed any wrongful or improper conduct that caused Exal to lose a business opportunity

with AB.  ECF No. 137 at 24–26.  Roeslein argues that Exal's fraud in the inducement claim

(Count II)  fails because Exal cannot prove that Roeslein had made any false statements when

Exal and Roeslein entered into the Mutual Confidentiality Agreement and Purchase Orders.  ECF

6

(4:12cv1830)

No. 137 at 26–27.  Exal opposed Roeslein's motion (ECF No. 140); Roeslein replied.  ECF No.

143.  The matter is ripe for adjudication.

## II.  Legal Standard

Summary judgment is appropriately granted when the pleadings, the discovery and

disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required

to file affidavits or other similar materials negating a claim on which its opponent bears the

burden of proof, so long as the movant relies upon the absence of the essential element in the

pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has

failed to establish an essential element of his case upon which he would bear the ultimate burden

of proof at trial."  *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

After the movant makes a properly supported motion, the burden shifts to the non-moving

party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely

on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be

resolved by a jury."  *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  To defeat the

motion, the non-moving party must "show that there is doubt as to the material facts and that the

record, taken as a whole, does not lead to a judgment for the movant."  *Guarino*, 980 F.2d at 403.

In reviewing a motion for summary judgment, the court must view the evidence in the light most

favorable to the non-moving party when deciding whether a genuine issue of material fact exists.

7

(4:12cv1830)

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily is not sufficient to defeat a motion for summary judgment. *Id.*

### III. Discussion

**A. Counts III, IV, and V: Breach of Contract**

Each of Exal's claims for breach of contract allege that Roeslein used confidential information obtained through work with Exal to assist MCC construct its own C2C line. ECF No. 101 ¶¶ 113, 120, 127. Exal alleges that Roeslein disclosed confidential information to AB and MCC in violation of the confidentiality provisions contained in the Mutual Confidentiality Agreement (ECF No. 141-4), the 2009 Purchase Order (ECF No. 141-2), and the 2011 Purchase Order (ECF No. 141-3).

8

(4:12cv1830)

In order to prove a breach of contract, a plaintiff must establish the existence and terms of a contract, the plaintiff's performance of the contract, the defendant's breach of the contract, and damage or loss to the plaintiff. *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio Ct. App. 2007). Unauthorized disclosure of confidential information obtained during a business relationship may give rise to a breach of contract claim. *See Copeco, Inc. v. Caley*, 632 N.E.2d 1299, 1299 (Ohio Ct. App. 1992); *Wagenheim v. Alexander Grant & Co.*, 482 N.E.2d 955, 963 (Ohio Ct. App. 1983); *Eng'g Excellence, Inc. v. Meola*, 2002 WL 31248192, at *6 (Ohio Ct. App. Oct. 8, 2002). Disclosure of information in the public domain does not support a claim for breach of confidentiality. *Rainworks Ltd. v. Mill-Rose Co.*, 622 F. Supp. 2d 650, 657–58 (N.D. Ohio 2009) (granting summary judgment on a breach of contract claim when plaintiff failed to establish the confidential nature of information that was allegedly disclosed); *Meola*, 2002 WL 31248192, at *6 (holding that only "information known only by appellant" can establish a breach of contract claim predicated on disclosure of confidential information).

Exal alleges that Roeslein disclosed four pieces of confidential information: (1) that Exal uses a long stroke lancing Sprimag sprayer, (2) that Exal uses a Minster triple action press,[7] (3) that Roeslein contacted Exal's coating supplier, Grace, and asked for the formula for use at AB and MCC, and (4) that Roeslein asked an employee, Nick Young, to take a picture of Exal's

---

[7] Although the machine is technically a double action press that uses a triple action die set, *see* ECF No. 137-8 at 139–40, the Opinion refers to this machine as the "Minster Triple Action Press" for simplicity.

9

(4:12cv1830)

Mall-Herlan necker.[8]  For the reasons that follow, none of Exal's allegations state an actionable

claim for breach of confidentiality.

### 1. The Lancing Sprimag Sprayer

Exal first argues that Roeslein disclosed Exal's use of a lancing Sprimag sprayer to MCC,

as reflected by MCC's production line's use of an identical machine.  ECF No. 137-27 at 30.

Exal cannot show, however, that this information was confidential at the time that Exal and

Roeslein entered into the Mutual Confidentiality Agreement or the Purchase Orders.

Undisputed evidence reveals that Exal itself had disclosed its use of the Sprimag

machine, both to the public at large and to MCC specifically.  Any of Exal's competitors,

including MCC, could immediately learn the manufacturer of Exal's lancing spray machine

because Exal had shared this fact with a trade publication.  *Packaging World* published an online

article on October 5, 2009 that discussed Exal's C2C line.  ECF No. 137-28 at 3.  The article

identifies Sprimag as the manufacturer of the machine that Exal used to spray the interior of its

---

[8]  In its Opposition Brief, Exal challenges Roeslein's contention that there are only four incidents of information sharing and states that "Roeslein's actions concerning these specific pieces of information is merely *indicative* of—and not the exclusive proof of—its information sharing."  ECF No. 140 at 26.  The record reflects, however, that counsel for Roeslein had repeatedly asked Mike Hoffman, Exal's CEO and Rule 30(b)(6) representative, to identify the confidential information that Roeslein had disclosed.  ECF No. 137-27 at 19–20, 26–27, 29–30, 35, 41, 46–47, and 54–55.  The four incidents are the only pieces of information that Exal identified.  "Although it is true that a corporation may be bound by the testimony of its Rule 30(b)(6) designee, that testimony is not 'tantamount to a judicial admission' and 'does not unequivocally bind' the corporation to the exclusion of other evidence that may explain or explore that testimony," *Little Hocking Water Ass'n, Inc. v. E.I. Du Pont de Nemours & Co.*, 2013 WL 1791083, at *11 (S.D. Ohio Apr. 26, 2013) (quoting *Coupled Prods., LLC v. Component Bar Prods.*, 2011 WL 5039792 (6th Cir. Oct. 24, 2011)), Exal has marshaled no such evidence to explain or elaborate on Hoffman's testimony.  Accordingly, Exal, not Roeslein, has constrained its breach of contract claims to these four alleged disclosures.

(4:12cv1830)

bottle cans. *Id.* at 5. Therefore, Exal's use of a Sprimag machine was public knowledge three days before the effective date of the 2009 Purchase Order (ECF No. 141-2 at 2), four days before Roeslein and Exal signed the Mutual Confidentiality Agreement (ECF No. 141-4 at 5), and more than a year before the effective date of the 2011 Purchase Order (ECF No. 141-3 at 2). *See Meola*, 2002 WL 31248192, at *5 (defining confidential information as that which is "known only to a limited few" and "not publicly disseminated").

Exal had also permitted employees of MCC to tour the production lines at Exal's plants, including its C2C line. ECF No. 137-11 at 58–59. On one such visit in 2006—three years before the Mutual Confidentiality Agreement and the first purchase order—Exal had asked MCC employees to inspect Exal's C2C line and make recommendations on improving its efficiency. ECF No. 137-19 at 28. The notes from that meeting include the manufacturer's name (Sprimag), the type of spray application (reciprocating lance type application), and a diagram of how the spray operates. ECF No. 137-20 at 2. Mark Viox testified that he had observed Exal using the same Sprimag machine for its impact extrusion lines. ECF No. 137-17 at 120–21. Exal has not presented evidence that it considered the machines confidential at the time it gave MCC employees access to its production lines, nor has it produced any evidence that Exal required MCC not to disclose the use of these machines.

Finally, Roeslein offered expert testimony that the Sprimag sprayer has been publicly known within the can and bottle manufacturing industry prior to Exal's incorporation of the machine into its C2C line. Tony Grandinetti testified that his former employer, Ball Packaging, had lance spray machines, but chose to use other types of spray nozzles for manufacturing bottle

(4:12cv1830)

cans.  ECF No. 137-8 at 142.  Grandinetti further opined that a company like Sprimag could

recommend a machine and nozzle to a customer based on the shape of the container to be

sprayed.  _Id._ at 209–10.  This expert testimony is corroborated by Mark Viox, who testified that

MCC worked directly with Sprimag to determine what type of spray machine to use on MCC's

C2C line.  ECF No. 137-17 at 121.

Exal's use of the Sprimag spray machine is not confidential information.  Exal had

disclosed its use of the machine in a trade publication prior to entering into its agreements with

Roeslein.  Moreover, Exal had permitted MCC—the alleged recipient of the confidential

information—to view and diagram the machine at Exal's plant years before Exal and Roeslein

signed their confidentiality agreement.  Finally, lance-style spray machines are commonplace

within the aluminum manufacturing industry.  Therefore, even if Roeslein had disclosed the use

of the Sprimag to MCC, doing so would not reveal confidential information.  Exal cannot show a

breach of the Mutual Confidentiality Agreement or the Purchase Orders based on disclosure of

the Sprimag sprayer.

### 2.  The Minster Triple Action Press

Exal argues that Roeslein disclosed Exal's use of a Minster triple action press to MCC

because MCC also used the machine on its C2C line.  ECF No. 137-27 at 20.  This assertion

suffers from the same defects as the alleged disclosure of the Sprimag.  The _Packaging World_

article on Exal's C2C line specifies that Exal uses a Minster press.  ECF No. 137-28 at 5.  The

article discusses the Minster with even more detail than the Sprimag, as it also indicates the serial

number of Exal's machine.  _Id._ ("The aluminum sheet is fed to a DAC-150-84 cupping press

(4:12cv1830)

from The Minster Machine Co. that punches the sheets into blanks that are drawn and redrawn into shallow cups.").  MCC also observed Exal's use of the Minster triple press when its employees visited Exal's plant in 2006, and the notes from that visit include a diagram of the press's die set.  ECF No. 137-20 at 1.  Roeslein's expert testified that aluminum manufacturing companies have used Minster presses since the 1970's, and the number of draws that the press needs to make—which in turn affects the die set included in the machine—is dictated by the physical properties of the metal.  ECF No. 137-8 at 125–27.  Roeslein's expert further testified that any aluminum supplier could recommend a die set based on the physical properties of the aluminum to be worked.  Id. at 120.  As is the case with the Sprimag, Exal's use of the Minster triple action press is not confidential information, and Roeslein's alleged disclosure does not violate the confidentiality provisions of the agreements between Exal and Roeslein.

### 3.  The Phone Call to the Coating Supplier

Exal also alleges a breach of confidentiality stemming from a call that Roeslein placed to Exal's coating supplier.  Mike Hoffman testified that Roeslein called Exal's supplier to ask for Exal's bottle can coating formula so that Roeslein could provide that information to AB or MCC.  ECF No. 137-27 at 39–41.  Exal's claim must fail, however, because Exal has not shown what confidential information was disclosed as a result of this conversation.  Mike Hoffman concedes that Exal had instructed the supplier not to provide the information to Roeslein, and that he "ha[d] no knowledge whatsoever" of any evidence suggesting that the supplier refused abide by Exal's instructions.  Id. at 41.  Roeslein cannot disclose that which is unknown to it.  The only evidence concerning the coating formula is testimony from Mark Viox that Roeslein did not give

13

(4:12cv1830)

Exal's formula to MCC.  ECF No. 137-17 at 119–20.  As Exal concedes there was no disclosure,

much less disclosure of confidential information, it cannot prove that Roeslein breached the

Mutual Confidentiality Agreement or the Purchase Orders.

### 4.  The Cell Phone Picture

The final alleged disclosure of confidential information pertains to an incident when a

Roeslein employee unsuccessfully attempted to take a photograph of Exal's necking machine.

According to Exal, David May instructed an employee, Nick Young, to take a photo of the

machine, but an Exal employee prevented Young from doing so.  ECF No. 137-27 at 42.  Exal's

allegation is not supported by the uncontested evidence.  Mike Hoffman admitted that he did not

know whether Young in fact took the photo.  *Id.* at 44.  May and Young, on the other hand, both

state that Young did not take the photo because an Exal employee instructed had him not to.

ECF Nos. 137-24 at 226; 137-31 at 182.  MCC did not receive any photograph from Roeslein of

Exal's necking machine.  ECF No. 137-17 at 119.  There is no evidence supporting Exal's

position that Roeslein disclosed information concerning Exal's necking machine to MCC.  Its

breach of confidentiality claims, therefore, cannot survive summary judgment.

### 5.  Conclusion

Exal has failed to create a disputed material fact as to any piece of allegedly confidential

information disclosed by Roeslein to AB or MCC.  Without such a disclosure, Exal cannot

demonstrate that Roeslein breached the confidentiality provisions of the Mutual Confidentiality

Agreement (ECF No. 141-4), the 2009 Purchase Order (ECF No. 141-2), and the 2011 Purchase

Order (ECF No. 141-3).  Accordingly, Counts III through V must fail, and summary judgment is

14

(4:12cv1830)

granted to Roeslein.

### B. Counts VI and VII: Tortious Interference

Exal has advanced two claims for tortious interference.  Count VII, Exal's claim for Tortious Interference with a Business Relationship, alleges that "Roeslein wrongfully and intentionally acted to harm Exal by interfering with, disrupting, and preventing Exal from entering into the originally discussed agreement with AB."  ECF No. 101 at ¶ 154.  Count VI, the claim for Tortious Interference with Prospective Economic Advantage, alleges that Roeslein's actions "prevent[ed] Exal from further developing and continuing its business relationship with AB."  *Id.* ¶ 139.

To prove tortious interference with prospective economic advantage and business relationship, a plaintiff must prove (1) the existence of a contract or business relationship, (2) the wrongdoer's knowledge of the contract or relationship, (3) the wrongdoer's intentional and improper interference causing a breach or termination of the contract or relationship, and (4) damages resulting therefrom.  *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995); *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.*, 678 N.E.2d 248, 252 (Ohio Ct. App. 1996).  Ohio courts have held that the tort also includes intentional interference with prospective contractual relations not yet reduced to a contract.  *Jedson Eng'g, Inc. v. Spirit Const. Servs., Inc.*, 720 F. Supp. 2d 904, 923 (S.D. Ohio 2010) (citing *Dolan v. Glouster*, 879 N.E.2d 838, 848 (Ohio Ct. App. 2007)).  When considering whether a party acted with improper motive, a court considers the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the

(4:12cv1830)

actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social

interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations

between the parties.  *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio

1999).

      Roeslein argues that Exal has failed to demonstrate that Roeslein intentionally and

improperly interfered with Exal's business relationship with AB.  For the reasons provided

below, the Court agrees with Roeslein as to Count VII, but disagrees as to Count VI.  Although

Exal has not created a triable issue as to any improper conduct interfering with the Original

Agreement that AB rejected in February 2011, Exal has created a genuine dispute as to whether

Roeslein's conduct constituted improper interference with any ongoing negotiations Exal had

with AB.

### 1.  Exal's Original Agreement with AB

      Count VII alleges that Roeslein improperly interfered with the "originally discussed

agreement with AB" when Roeslein began to assist MCC with the construction of an aluminum

bottle can line.  ECF No. 101 ¶ 154.  The undisputed evidence reveals that AB had informed

Exal by February 2011 that it no longer intended to sign the Original Agreement.  ECF No. 137-

23 at 17.  Roeslein did not start working on the MCC aluminum bottle can line until June 2011.

ECF Nos. 137-17 at 59–60; 141-20.  AB had declined the terms of the Original Agreement,

therefore, before Roeslein had begun assisting MCC on its aluminum bottle can project.

      Exal argues that Roeslein had held a number of meetings with AB before February 2011

16

(4:12cv1830)

which, according to Exal, demonstrate improper conduct taken to interfere with the December 2010 Original Agreement.  Exal argues that a July 2010 meeting between Roeslein and AB, a July 2010 tour of Roeslein's facility in Red Bud, Illinois, and a February 2011 tour of AB's Arnold plant reveal that Roeslein had discussed aluminum bottle can manufacturing with AB before February 2011.  The evidence shows, however, that each of these meetings related to traditional can manufacturing and not the aluminum bottle cans that were the subject of Exal and AB's agreement.  Terry Leebolt, Roeslein's Vice-President of Engineering, testified that, during the July 2010 meeting, AB discussed its desire to vertically integrate its standard can manufacturing capabilities with plants in Brazil or Russia.  ECF No. 137-6 at 149.  Mark Viox testified that the two companies did not discuss bottle cans during the Red Bud facility tour. ECF No. 137-17 at 53–54.  Leebolt testified that Roeselin and AB did not discuss bottle cans during the February 2011 tour.  ECF No. 141-14 at 50 p. 193.  There is no evidence that Roeslein and AB had discussed bottle cans before AB informed Exal that it no longer intended to sign the Original Agreement.  Exal cannot show any conduct on the part of Roeslein that improperly influenced AB's decision.[9]

### 2.  Exal's Continuing Relationship with AB

Count VI alleges that Roeslein "prevent[ed] Exal from further developing and continuing its business relationship with AB."  ECF No. 101 ¶ 139.  For the reasons that follow, the Court

_____

[9]  Exal argues that to April 2011 email and a conversation during a May 2011 trade show are probative of improper interference.  Both occurred after AB had independently reached a decision not to sign the bottle can agreement with Exal, and therefore could not have affected AB's decision.

(4:12cv1830)

concludes that Exal has presented sufficient evidence to survive summary judgment on its claim

for tortious interference with prospective economic advantage.

### a.  The Existence of a Contract Or Business Relationship

Ohio courts have held that tortious interference includes interference with prospective

contractual relations.  *Jedson Eng'g, Inc. v. Spirit Const. Servs., Inc.*, 720 F. Supp. 2d 904, 923

(S.D. Ohio 2010) (citing *Dolan v. Glouster*, 879 N.E.2d 838, 848 (Ohio Ct. App. 2007)); *see also*

Restatement (Second) of Torts § 766B, cmt. c. (1979) ("The relations protected against

intentional interference by the rule stated in this Section include any prospective contractual

relations . . . Interference with the exercise by a third party of an option to renew or extend a

contract with the plaintiff is also included.").

Exal has presented sufficient evidence to survive summary judgment on the existence of a

prospective business relationship between Exal and AB beyond the February 2011 date when AB

had informed Exal that it would not sign the Original Agreement.  Exal continued to negotiate

with AB after February 2011.  ECF No. 137-23 at 17–18.  These talks were ongoing as of the

date when Roeslein contracted to assist MCC in creating its own bottle can line.  ECF No. 141-5

at 77 p. 304.  Mike Hoffman testified that Exal still believed it would produce the 16-ounce

bottle cans for AB until the company informed Exal in February 2012 that AB would produce its

own.  ECF No. 137-2 at 55.  This evidence demonstrates that Exal had a prospective business

relationship with AB.

### b.  The Wrongdoer's Knowledge of the Contract or Relationship

Exal has presented evidence that Roeslein knew of the ongoing talks between Exal and

18

(4:12cv1830)

AB beyond February 2011.  Roeslein's president, David May, acknowledged that Exal was still

pursuing a bottle can contract with AB in June 2011, around the same time that Roeslein agreed

to assist MCC with its own bottle can manufacturing line.  ECF No. 141-5 at 77 p. 304.  Internal

Roeslein correspondence also reveals that Roeslein was still providing Exal with assistance in

expanding Exal's manufacturing capabilities in anticipation of a deal with AB.  ECF No. 142-2

at 2.

### c. Intentional and Improper Interference

Ohio courts turn to the Restatement for guidance when evaluating whether conduct

interfering with a contract or business relationship was intentional and improper.  *See Fred*

*Siegel Co., L.P.A. v. Arter & Hadden, 707 N.E.2d 853, 860 (Ohio 1999)* ("We therefore adopt

767 of the Restatement, which provides guidance to be followed in determining whether an

actor's interference with another's contract is improper."); *Kenty v. Transamerica Premium Ins.*

*Co.*, 650 N.E.2d. 863, 866 (Ohio 1995) (adopting the Restatement definition of tortious

interference with contract).  Regarding intent, the Restatement provides that "[t]he interference

with the other's prospective contractual relation is intentional if the actor desires to bring it about

or if he knows that the interference is certain or substantially certain to occur as a result of his

action."  Restatement (Second) of Torts § 766B, cmt. d. (1979).  Typically, balancing whether

conduct was improper is a task reserved for the jury.  *See Kehoe Component Sales Inc. v. Best*

*Lighting Products, Inc.*, 933 F. Supp. 2d 974, 1017–18 (S.D. Ohio 2013) (citing *Brookeside*

*Ambulance, Inc. v. Walker Ambulance Serv.*, 678 N.E.2d 248, 253 (Ohio Ct. App. 1996) for its

holding that whether a defendant's "actions were improper is a question for the trier of fact to

(4:12cv1830)

determine after it balances the factors set forth in Section 767 of the Restatement").

The Court concludes that Exal can establish intent by showing that Roeslein knew that the interference is certain or substantially certain to occur as a result of its actions.  It is unclear whether Roeslein had inquired into the effect MCC's bottle can project would have on Exal's work for AB.  David May testified that he had asked MCC officials about the effect the project would have on Exal, and that MCC assured Roeslein that it would have no effect.  ECF No. 141-5 at 78 p. 305.  When previously approached by AB for assistance in developing a standard can manufacturing plant in Brazil, Roeslein's management internally considered what effect that project would have on its other clients.  ECF No. 141-13 at 3.  It is reasonable to infer that Roeslein, "the world's premier system integrator for can manufacturing plants," routinely evaluates all new business opportunities for potential consequences to pre-existing relationships. ECF No. 141-1 at 3.  When viewing this evidence in the light most favorable to Exal, a jury could reasonably conclude that Roeslein decided to help MCC, a subsidiary of AB, on a project similar to Exal's, knowing with at least substantial certainty that MCC's project would impact Exal's relationship with AB.

Exal has also presented sufficient evidence to allow a jury to conclude that Roeslein's conduct was improper.  The Restatement contains specific examples of the factors indicative of improper conduct that are directly applicable to this case.  For example, business ethics and customs may be significant in weighing the nature of the actor's conduct.  Restatement (Second) of Torts § 767, cmt. c. (1979).  The Restatement also recognizes a relationship between motive and the proximity of the conduct to the interference.  When there is a direct connection between

20

(4:12cv1830)

the conduct and interference, "as when A induces B to sell a particular article to him, knowing that B is under contract to sell it to C," the motive does not play as strong a role.  Restatement (Second) of Torts § 767, cmt. d. (1979).  The relationship of the parties is more significant to the analysis when the alleged wrongdoer is not a competitor of the victim.  *Id.* cmt. i. ("In a case where A is the actor, B is the injured party and C is the third party influenced by A's conduct, the significant relationship may be between any two of the three parties.  Thus A and B may be competitors, and A's conduct in inducing C not to deal with B may be proper, though it would have been improper if he had not been a competitor.").  Whether the conduct was improper ultimately boils down to "whether the actor's conduct was fair and reasonable under the circumstances.  Recognized standards of business ethics and business customs and practices are pertinent, and consideration is given to concepts of fair play and whether the defendant's interference is not sanctioned by the 'rules of the game.'"  *Id.* cmt. j.

These factors support denying summary judgment for Roeslein and allowing a jury to decide whether Roeslein acted improperly.  Mike Hoffman testified that he believed that he and David May had a gentlemen's agreement that Roeslein would only work with Exal in creating a C2C bottle can line for AB.  ECF No. 137-2 at 118–20.  The two spoke in October 2011, at which time Hoffman asked May about rumors that Roeslein had begun working with MCC.  ECF No. 141-23 at 16 p. 59.  This evidence plausibly suggests that Roeslein's simultaneous work with Exal and MCC was contrary to accepted business ethics.  Given the proximity between Roeslein's work with MCC and Exal's less-profitable contract with AB, Exal does not need to present evidence that Roeslein had a wrongful motive for their actions.  The collaborative

21

(4:12cv1830)

relationship between Exal and Roeslein is also significant.  Roeslein was assisting, rather than

competing with, Exal at the same time that Roeslein also worked with a direct competitor to

Exal's business relationship with AB.  Subsequent to Roeslein's assistance, MCC received the

AB contract that Exal sought to obtain through its engagement with Roeslein.  While there are

factors in the Restatement that may cut against Exal's case, there is enough evidence to permit a

jury to conclude that Roeslein acted improperly by working with MCC at the same time as Exal.

### d.  Damages

Exal officials have testified that the contract that Exal eventually signed with AB

provided that Exal produce a lower volume of a less profitable product than what was originally

negotiated with AB.  ECF No. 137-2 at 52.  If a jury concludes that Roeslein improperly

interfered with Exal's negotiations with AB, then it could also find that Exal suffered damages as

a result of Roeslein's conduct.

### 3.  Conclusion

Based on the forgoing, the Court grants Roeslein's Motion for Summary Judgment as to

Count VII, Exal's claim for Tortious Interference with a Business Relationship, because Exal has

failed to present any evidence that Roeslein interfered with the Original Agreement.  The Court

denies Roeslein's Motion for Summary Judgment as to Count VI, Exal's claim for Tortious

Interference with Prospective Economic Advantage.  Exal has presented sufficient evidence to

permit a jury to conclude that Roeslein improperly assisted MCC develop its own C2C line while

Exal continued to negotiate a contract with AB.

(4:12cv1830)

### C.  Count II: Fraud in the Inducement

Exal alleges that Roeslein made false representations regarding confidentiality in order to entice Exal into signing the 2011 Purchase Order.  ECF No. 101 ¶ 100.  Exal contends that Roeslein employees repeatedly assured Exal that Roeslein would protect Exal's confidential information in order to induce Exal to sign the 2011 Purchase Order.  ECF No. 101 ¶¶ 102–03.  Exal also alleges that Roeslein had deliberately withheld the work that Roeslein was simultaneously performing for AB and MCC in order to induce Exal to enter into the 2011 Purchase Order.  *Id.*  According to Exal, it would not have signed the 2011 Purchase Order had Roeslein not made representations of confidentiality or properly disclosed the nature of its work with AB and MCC.  *Id.* ¶ 104.

To state a claim for fraud in the inducement, Exal needs to prove (1) a representation or concealment of fact, (2) material to the transaction, (3) was made with knowledge of its falsity, (4) with the intent of misleading another into relying upon the false statement, (5) justifiable reliance on the representation, and (6) resulting injury proximately caused by such reliance.  *See Volbers-Klarich v. Middletown Mgt., Inc.*, 929 N.E.2d 434, 440 (Ohio 2010); *Gentile v. Ristas*, 828 N.E.2d 1021, 1033 (Ohio Ct. App. 2005).  Fraud in the inducement covers both affirmative misrepresentations and non-disclosures; however, when a claim is predicated on the latter, there must exist a duty to disclose under the circumstances of the transaction.  *Gentile*, 828 N.E.2d at 1034; *Parahoo v. Mancini*, 1998 WL 180539, at *7 (Ohio Ct. App. Apr. 14, 1998).

Both of Exal's theories of fraudulent inducement must be rejected.  As discussed above, Roeslein did not disclose any of Exal's confidential information.  It cannot be said, therefore, that

23

(4:12cv1830)

Roeslein knowingly misrepresented to Exal that it would protect Exal's confidential information when the parties entered into the January 2011 Purchase Order.  There is no evidence that shows that Roeslein fraudulently misrepresented that it would abide by its promise to maintain confidentiality.  *See Yo-Can, Inc. v. The Yogurt Exch., Inc.*, 778 N.E.2d 80, 89 (Ohio Ct. App. 2002) ("[A] promise made with a present intention not to perform is a misrepresentation of an existing fact even if the promised performance is to occur in the future.").  Moreover, Exal cannot prove that Roeslein had a duty to disclose its relationship with MCC.  The Mutual Confidentiality Agreement expressly disclaims "any other relationship other than expressly, and not impliedly, set forth" in the agreement.  ECF No. 141-4 at 4.  Under either theory, Exal lacks an essential element to its fraud in the inducement claim. The Court grants summary judgment to Roeslein and dismisses Count II.

### IV.  Conclusion

For the forgoing reasons, the Court hereby denies Roeslein's Motion for Summary Judgment as to Count VI, Exal's claim for tortious interference with prospective economic advantage, and grants the motion as to Exal's remaining claims.

Count VI will proceed to trial.


IT IS SO ORDERED.


 August 17, 2015                                       */s/ Benita Y. Pearson*       
Date                                            Benita Y. Pearson
                                            United States District Judge